IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID TRUMP,                          :
                                      :
            Plaintiff                 :    CIVIL No. 1:14-CV-00920
                                      :
      vs.                             :    Hon. John E. Jones III
                                      :
CAROLYN W. COLVIN, ACTING             :
COMMISSIONER OF SOCIAL                :
SECURITY,                             :
                                      :
            Defendant                 :

**MEMORANDUM**

June 22,2015

**BACKGROUND**

    The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff David Trump's claim for social security disability insurance benefits and supplemental security income benefits.

    Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Trump met the insured status requirements of the Social Security Act through September 30, 2013. Tr. 16, 18 and 218.[1]

---

[1]References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of the Answer on July 31, 2014.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Trump protectively filed[2] applications for disability insurance benefits and supplemental security income benefits on December 8, 2010. Tr. 16, 107-108, 196-209 and 213. Trump alleged that he became disabled on September 17, 2010, because of mental impairments.[3]  Tr. 196, 203 and 223.  Trump does not allege that he suffers from any physical impairments and in the present appeal[4] only mentions bipolar disorder, as his mental impairment.[5] Tr. 223;

---

[2]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

[3]Trump previously filed applications for DIB and SSI on August 1, 2007, claiming disability as of January 1, 2006, because of mental impairments. Tr. 80. Those applications were denied by an administrative law judge on October 28, 2008, and there is no indication that Trump sought further administrative or federal court review.

[4]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

[5]"Bipolar disorder, formerly, called manic depression, causes extreme mood swings that include emotional highs (mania or hypomania) and lows (depression). When you become depressed, you may feel sad or hopeless and lose interest or pleasure in most activities.  When you mood shifts in the other direction, you may feel euphoric and full of energy.  Mood shifts may occur only a few times a year or as often as several times a week.  Although bipolar

Doc. 11, Plaintiff's Brief, p. 3. The applications were initially denied by the Bureau of Disability Determination[6] on February 15, 2011. Tr. 16 and 109-117. On April 4, 2011, Trump requested a hearing before an administrative law judge. Tr. 16 and 122-123. After over 14 months had passed, a hearing was held on June 22, 2012. Tr. 16 and 29-76. Trump was represented by counsel at the hearing. Id. On July 25, 2012, the administrative law judge issued a decision denying Trump's applications. Tr. 16-25.  As will be explained in more detail *infra* the administrative law judge found that Trump failed to prove that he met the requirements of a listed impairment or suffered from work-preclusive functional limitations through the date of the decision. Id.

On September 25, 2012, Trump filed a request for review with the Appeals Council and after over 12 months had elapsed the Appeals Council on October 8, 2013, concluded that there was no basis upon which to grant Trump's request for review. Tr. 7-9. On April 10, 2014, the Appeals Council set aside the earlier decision

---

disorder is a disruptive, long-term condition, you can keep you moods in check by following a treatment plan.  In most cases, bipolar disorder can be controlled with medications and psychological counseling (psychotherapy)." Bipolar Disorder, Definition, Mayo Clinic Staff, http://www.mayoclinic.org/diseases-conditions/bipolar-disorder/basics/definition/CON-20027544 (Last accessed June 16, 2015).

[6]The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 109 and 113.

3

in order to consider additional information and after so doing

again found that there was no basis upon which to grant Trump's

request for review.[7] Tr. 2-6.

---

[7]In denying review the Appeals Council considered medical
reports relating to periods of time after July 25, 2012, and stated
in relevant part follows:

> In looking at your case, we considered the reasons you
> disagree with the decision and the additional evidence
> listed on the enclosed Order of Appeals Council [five
> pages of medical evidence prepared by Adams Hanover
> Counseling Services, Inc, dated from September 10, 2012
> through March 22, 2013].

> We considered whether the Administrative Law Judge
> actions, findings, or conclusion is contrary to the
> weight of the evidence of record.  We found that this
> information does not provide a basis for changing the
> Administrative Law Judge's decision.

> We also looked at TrueNorth Wellness Services dated from
> October 9, 2013 (pages 3). The Administrative Law Judge
> decided your case through July 25, 2012.  This new
> information is about a later time.  Therefore, it does
> not affect the decision about whether you were disabled
> beginning on or before July 25, 2012.

> If you want us to consider whether you were disabled
> after July 25, 2012, you need to apply again.

The evidence submitted by Trump to the Appeals Council after the
administrative law judge's decision of July 25, 2012, is not a
basis to reverse that decision or remand for further proceedings.
Evidence submitted after the administrative law judge's decision
cannot be used to argue that the administrative law judge's
decision is not supported by substantial evidence.  Matthews v.
Apfel, 239 F.3d 589, 594-595 (3d Cir. 2001).  The only purpose for
which such evidence can be considered is to determine whether it
provides a basis for remand under sentence 6 of section 405(g), 42
U.S.C.  Szubak v. Secretary of Health and Human Servs., 745 F.2d
831, 833 (3d Cir. 1984).  Under sentence 6 of section 405(g) the
evidence must be "new" and "material" and a claimant must show
"good cause" for not having incorporated the evidence into the
administrative record. Id. The Court of Appeals for the Third

Trump then filed a complaint in this court on May 13, 2014. Supporting and opposing briefs were submitted and the appeal became ripe for disposition on November 19, 2014, when Trump filed a reply brief.

Trump, who was born in the United States on June 20, 1963,[8] graduated from high school in 1981 and can read, write, speak and understand the English language and perform basic mathematical functions, including counting change and using a checkbook and money orders.  Tr. 108, 203, 222-223, 236 and 346. During his elementary and secondary schooling, Trump attended regular education classes. Tr. 224.  After graduating from high school, he attended college for 1 to 2 years  and took courses in real estate sales, business and culinary arts.  Tr. 224, 286, 294 and 346. He updated his course work in real estate sales in 2007. Tr. 224.

---

Circuit explained that to be material "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id.  The items submitted to the Appeals Council related to a time after the administrative law judge issued his decision and, consequently, are not material.

[8]At the time of the administrative hearing held in this case Trump was 49 years of age and considered a "younger individual" whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. § 404.1563(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

Trump's work history covers 31 years of which 20 years involved self-employment as a realtor. Tr. 214, 224 and 244. Trump in a document filed with the Social Security Administration stated that he worked as a realtor from 1987 to 2007; as a cashier for a department store from 2005 to 2006; as an aide at a group home during 2008; and as aide for a paralyzed individual from 2008 to 2010. Tr. 244-248.

The records of the Social Security Administration reveal that Trump had earnings in the years 1978 through 1990, 1992 through 2003, and 2005 through 2010. Tr. 214. Trump's annual earnings range from a low of $2314.62 in 1993 to a high of $65,829.00 in 2002. Id. During the years 1995 through 2003, Trump's earnings averaged $38,790.45, from self-employment as a realtor. Id. Trump had no reported earnings in 2004; in 2005 he earned $3318.69 working as cashier at Kohl's Department Store; in 2006 he earned $10,337.00 as a cashier at Kohl's Department Store and from self-employment as a realtor; in 2007 he earned $6410.27 as a residential service worker for Bell Socialization Services, Inc, and Anytime Home Care, Inc., both located in York, Pennsylvania; in 2008 he earned $14,437.70 as a residential service worker for Bell Socialization Services, Inc., and as a residential aide assisting a paralyzed individual for United Cerebral Palsy of South Central Pennsylvania, Inc.; and in 2009 and 2010 he earned $18,311.76 and  $17,428.04, respectively, also working as an aide

assisting a paralyzed individual for United Cerebral Palsy of South Central Pennsylvania, Inc. Tr. 216-217. Trump's total earnings during his 31 years of employment were $542,167.11. Id.

An employment questionnaire completed by Bell Socialization Services, Inc., reveals that Trump worked for that company from October 5, 2007, through August 29, 2008, and he lost his job with that company because of work performance. Tr. 182-184. The employer did not elaborate on the specifics of Trump's work performance which resulted in his discharge. Id. The employer in answering the questionnaire also stated that in general Trump's attendance was fine and he customarily worked 40 hours per week. Id.

At the administrative hearing Trump testified that his position with Cerebral Palsy of South Central Pennsylvania ended because the individual he was taking care of passed away. Tr. 35. However, in a document filed with the Social Security Administration, Trump stated that he stopped working on September 17, 2010, "[b]ecause of [his] condition(s)." Tr. 223.

A vocational expert identified Trump's past relevant employment history[9] as follows: (1) a residential care aide,

---

[9]Past relevant employment in the present case means work performed by Trump during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant work, the work must also amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

described as semiskilled, medium work; and (2) a realtor, described as skilled, light work.[10]   Tr. 69-70.

_____

[10]The terms sedentary, light, medium, heavy and very work are defined in the regulations of the Social Security Administration as follows:

>    (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

>    (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

>    (c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

>    (d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

>    (e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50

At the administrative hearing held on June 22, 2012, Trump testified that he had a driver's license and drove one to two times per week; he goes food shopping with a friend and does his laundry at a laundromat; he went to his 30-year high school class reunion in 2011 and he had a "good time" as "[i]t was nice to rekindle relationships with several different people;" he takes cello lessons every Wednesday and plays the handbells for his church choir; he enjoys reading, spending time with his family, and traveling; he reads two hours per day with breaks; and he read the entire Twilight series and other sagas. Tr. 37-41 and 44-45.

Trump testified that he could no longer perform work as a residential aide because he had "no energy" and "sleeps a lot." Tr. 36. He also testified that his last mental breakdown was during a camping trip in 2010, but he was not taking his medications at the time. Tr. 46. Since that incident, Trump testified that he had diligently taken his medications and went to individual counseling and group therapy weekly. Tr. 49-50. Trump's friend and roommate, Elaine Shealy, corroborated Trump's testimony but stated that he has a meltdown once every three years. Tr. 56. The record does reveal that Trump had inpatient treatment at The Meadows Psychiatric Center for 3 days in January of 2005 and for 17 days

pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

20 C.F.R. § 404.1567.

in June–July, 2007.[11] Tr. 285-297.  At discharge in 2005 his Global

Assessment of Functioning (GAF) score was 60 and at discharge in

2007 his GAF score was 71.[12] Id.

In a "Function Report - Adult" dated January 1, 2011,

---

[11]At discharge in 2007 it was reported that apparently prior to
the inpatient treatment, Trump was using marijuana on a daily basis
and had been consuming alcohol for three to four weeks, and "before
that vodka socially." Tr. 286.

[12]The GAF score allows a clinician to indicate his judgment of
a person's overall psychological, social and occupational
functioning, in order to assess the person's mental health illness.
Diagnostic and Statistical Manual of Mental Disorders 3-32 (4th ed.
1994). A GAF score is set within a particular range if either the
symptom severity or the level of functioning falls within that
range. Id. The score is useful in planning treatment and predicting
outcomes. Id.  The GAF rating is the single value that best
reflects the individual's overall functioning at the time of
examination.  The rating, however, has two components: (1) symptom
severity and (2) social and occupational functioning.  The GAF is
within a particular range if either the symptom severity or the
social and occupational level of functioning falls within that
range.  When the individual's symptom severity and functioning
level are discordant, the GAF rating reflects the worse of the two.
Thus, a suicidal patient who is gainfully employed would have a GAF
rating below 20.  A GAF score of 21-30 represents behavior
considerably influenced by delusions or hallucinations or serious
impairment in communication or judgment or inability to function in
almost all areas.  A GAF score of 31-40 represents some impairment
in reality testing or communication or major impairment in several
areas, such as work or school, family relations, judgment, thinking
or mood. Id.  A GAF score of 41-50 indicates serious symptoms or
any serious impairment in social, occupational or school
functioning.  Id.  A GAF score of 51 to 60 represents moderate
symptoms or any moderate difficulty in social, occupational, or
school functioning. Id. A GAF score of 61 to 70 represents some
mild symptoms or some difficulty in social, occupational, or school
functioning, but generally functioning pretty well with some
meaningful interpersonal relationships. Id. A GAF score in the 71-
80 range reflects that symptoms, if present, are transient and
expectable reactions to psychosocial stressors, with no more than a
slight impairment in social, occupational, or school functioning.
Id.

Trump stated that he takes care of a cat; he had no problems with personal care, such as dressing, bathing, shaving, and feeding himself; he does not need any reminders to take care of personal needs and grooming; he rakes leaves in the fall and takes the trash out; he goes outside "multiple times during the day;" he is able to drive a car and ride in a car; he shops in stores and is able to count change and pay bills; he spends time talking on the phone daily with friends and face-to-face not as frequent; he attends church; he does not need reminders to go places; and he has no problems getting along with family, friends and neighbors. Tr. 233-238. Trump also reported that he never was fired from a job because of problems getting along with other people and that he is respectful "to authority figures when [his] medication is in order." Tr. 239.  In the "Function Report - Adult" completed by Trump when asked to check items which are affected by his illnesses or conditions did not check the following: lifting, squatting, bending, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, understanding, following instructions and using his hands. Tr. 238.  Trump did check that he had problems with standing, completing tasks, concentration and getting along with others. Id. Trump also noted that his medications make him sleepy and he sleeps periodically throughout the day. Tr. 233.

When Trump was interviewed face-to-face by an employee of

the Social Security Administration on December 13, 2010, with respect to his applications, the interviewer noted that Trump was cooperative, pleasant, appropriately dressed and groomed; and Trump had no problems with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering questions, sitting, standing, walking, seeing, using his hands and writing. Tr. 219-220.

For the reasons set forth below we will affirm the decision of the Commissioner denying Trump's applications for disability insurance benefits and supplemental security income benefits.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir.

2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

13

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work

14

which exists in the national economy, regardless of
whether such work exists in the immediate area in which he
lives, or whether a specific job vacancy exists for him,
or whether he would be hired if he applied for work.  For
purposes of the preceding sentence (with respect to any
individual), "work which exists in the national economy"
means work which exists in significant numbers either in
the region where such individual lives or in several
regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[13] (2) has an impairment that is severe or a combination of impairments that is severe,[14] (3) has an

_____

[13]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

[14] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to

impairment or combination of impairments that meets or equals the requirements of a listed impairment,[15] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[16]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is

---

perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

[15]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

[16]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## MEDICAL RECORDS

Before we address the administrative law judge's decision and the arguments of counsel, we will review some of Trump's medical records.   The relevant time period for reviewing the medical records is from September 17, 2010, the alleged disability onset date, through July 25, 2012, the date the administrative law judge issued the decision denying Trump benefits. The court will, however, commence by reviewing medical records that pre-date Trump's alleged disability onset date by about 3 months.

On June 21, 2010, Trump had an appointment regarding complaints of bipolar disorder with Anessa Inman, a certified physician's assistant, employed by Family First Health of Hanover, Pennsylvania. Tr. 313.  Ms. Inman noted that Trump had "not been seen in quite sometime" and that "[h]e used to see [Edward Coronado, M.D.] for his bipolar disorder" but "he lost his insurance and therefore has not been able to [see him]." Id.  Ms. Inman also noted that Trump had not been taking any psychiatric

17

medications for about a year and that Trump indicated that his bipolar disorder is primarily characterized by depression. Id. Trump denied "feeling manic." Id.
Trump reported having trouble sleeping and getting out of bed in the morning but he denied racing thoughts, homicidal and suicidal thoughts, and hallucinations. Id. Ms. Inman's assessment,[17] inter alia, was that Trump suffered from severe bipolar disorder, major depressive type, and prescribed the antidepressant drug Seroquel. Id.

On August 5, 2010, Trump had a follow-up appointment with Ms. Inman to discuss his psychiatric medications. Tr. 312. Trump reported no significant improvement in his mood and complained of irritability. Id. He also reported smoking more frequently because of his agitation and that he was having a hard time sleeping. Id. Trump denied racing thoughts and manic and depressive episodes. Id. Ms. Inman's assessment was that Trump suffered from bipolar disorder and she prescribed the antipsychotic medication Zyprexa which is used to treat bipolar disorder in adults.[18] Id. Ms. Inman

---

[17]Under the regulations of the Social Security Administration a physician's assistant is not an acceptable medical source to provide a diagnostic assessment. 20 C.F.R. § 404.1513(a). A phsyician's assistant is only an "other source" who may be used to show the severity of a diagnosed impairment and how it affects the individual's ability to work. 20 C.F.R. § 404.1513(d). Ms. Inman in her report of this appointment did not provide any statement regarding Trump's ability to work.

[18]Zyprexa, Drugs.com, http://www.drugs.com/zyprexa.html (Last accessed June 17, 2015).

scheduled a 1-month followup appointment for September 9, 2010, "to see how he [was] doing with the Zyprexa." Id. Trump was a "no show" at that appointment. Id.

On November 22, 2010, Trump had an appointment with Ms. Inman regarding his medications for his bipolar disorder. Tr. 310. Trump told Ms. Inman that he "had gotten into some trouble with the law and was incarcerated for about 8 weeks." Id. He further stated that "he was having severe manic episodes and was acting out" and that he had not been taking the Zyprexa that she had given him. Id. Trump's current medications, which were prescribed apparently when he was released from prison, were listed as Thorazine,[19] Vistaril,[20] Haldol,[21] Cogentin,[22] and Prilosec (stomach acid-reducing medication omeprazole). Id. Ms. Inman's assessment was that Trump suffered from bipolar disorder and she continued his current medications.

[19] Thorazine (generic chlorpromazine) "is an antipsychotic medication . . . used to treat . . . disorders such as schizophrenia or manic depression[.]" Thorazine, Drugs.com, http://www.drugs.com/mtm/thorazine.html (Last accessed June 19, 2015).

[20] "Vistaril is used as sedative to treat anxiety and tension."Vistaril, Drugs.com, http://www.drugs.com/vistaril.html (Last accessed June 19, 2015).

[21] Haldol is an antipsychotic medications used to treat schizophrenia as well as "to control the symptoms associated with Tourette disorder. It may be used for other conditions as determined by your doctor." Haldol, Drugs.com, http://www.drugs.com/cdi/haldol.html (Last accessed June 19, 2015).

[22] Cogentin is "used to control tremors and stiffness of the muscles due to certain antipsychotic medicines[.]" Cogentin, Drug.com, http://www.drugs.com/cdi/cogentin.html (Last accessed June 19, 2015).

Id.

On November 30, 2010, Trump was evaluated by David Einhorn, a licensed clinical social worker with a Master's degree in social work, of Adams-Hanover Counseling Services, Hanover, Pennsylvania.[23] Tr. 340-342.   During a clinical interview Trump reported that since 2002 he suffered from severe mood swings involving depression and manic episodes. Tr. 340.   Trump indicated that he was having no problems following his treatment regime which consisted of counseling and medications.   Id. Trump listed his current medications as Zyprexa, trazodone,[24] Haldol, Vistaril, Cogentin, Prilosec, and Thorazine.   Id. Trump denied any suicidal or homicidal thoughts; he reported he currently was involved in criminal proceedings, apparently on probation and that he no longer uses marijuana or alcohol; he last used alcohol on November 22, 2010, and illicit drugs on September 22, 2010; he smokes one pack of cigarettes per day; and he lives with a friend, Elaine Sheely. Tr. 340-341.   A mental status examination revealed that Trump was well-groomed; he was oriented to person, place and time; he had good behavior, eye contact and motor activity; his manner was cooperative, appropriate and trusting; his speech was normal; his

---

[23]A licensed clinical social worker is not an "acceptable medical source' under the regulations of the Social Security Administration. Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007).

[24]Trazodone is used to treat major depressive disorder. Trazodone, Drugs.com, http://www.drugs.com/trazodone.html (Last accessed June 19, 2015).

mood was depressed; his affect was broad; he reported fair sleep and appetite; his thought processes were logical and organized; his thought content was normal; he had no perceptual hallucinations or delusions; his memory was intact; his intelligence was average; his judgment was mildly impaired; and his insight regarding his disorder was limited. Tr. 341. Mr. Einhorn's diagnostic impression was that Trump suffered from bipolar disorder with depression; he had mild psychosocial and environmental factors which impacted the diagnosis, treatment and prognosis of his mental disorder (Axis IV); and Mr. Einhorn gave Trump a GAF score of 61, representing mild symptomatology. Id.  On November 30, 2010 Mr. Einhorn also developed a treatment plan for Trump which involved, inter alia, referring Trump to therapy and Trump agreed with the plan. Tr. 344-345.  On December 1, 2010, Dr. Coronado, M.D., Mr. Einhorn's supervisor, approved the treatment plan developed by Mr. Einhorn. Tr. 345.  There is no indication that Dr. Coronado interviewed Trump on November 30, 2010.

On December 7, 2010, Trump had an appointment with Ms. Inman regarding his medications. Tr. 309. Trump reported that he was "doing quite well on all the medications that he [was] taking." Id.  He further stated that he was "no longer feeling depressed, however, he was having some problems with anxiety." Id. Ms. Inman noted that Trump was alert and oriented to person, place and time and did not appear anxious and was coherent. Id. Ms. Inman's

diagnostic assessment was that Trump suffered from bipolar disorder and gave Trump a GAF score of 80, representing transient and expectable reactions to psychosocial stressors. Tr. 309, 320 and 360. Ms. Inman continued Trump on his current medications which were Zyprexa, Thorazine, Vistaril, Haldol, Cogentin, Trazodone and Ativan.[25] Id.   In conflict with the GAF score of 80, Ms. Inman on December 7th also completed a document on behalf of Trump entitled "Certification of Health Care Provider Under the Federal Family and Medical Leave Act of 1993" in which she stated in a conclusory fashion that Trump was "unable to perform work of any kind due to [his] own condition and medical leave is required for [his] absence from work" and that the duration of the incapacity would be "1-3 months, very hard to predict." Tr. 317. She further indicated that the Trump was "currently incapacitated" for an "unknown duration." Id.

On December 20, 2010, Trump was evaluated by Dr. Coronado of Adams-Hanover Counseling Services. Tr. 346-348. During the clinical interview Trump told Dr. Coronado that he was incarcerated from September 17, 2010, to November 27, 2010, for possession of marijuana and disorderly conduct and that he did not take his medications for 1 year because he felt great and he could not afford them. Tr. 346. Trump stated that he was on the antipsychotic

_____

[25]Ativan (generic lorazepam) is used to treat anxiety disorders. Ativan, Drugs.com, http://www.drugs.com/ativan.html (Last accessed June 19, 2015).

medication Abilify[26] and "it worked wonderfully for [him]." Id.

Trump told Dr. Coronado that he was absent-minded and disorganized

and most of the time he has racing thoughts. Id.  Trump denied

suicidal and homicidal thoughts and plans. Id. Trump requested that

Dr. Coronado prescribe him Abilify and an antidepressant drug. Id.

Trump also denied any current physical medical conditions. Tr. 347.

A mental status examination revealed that Trump was alert and in

no emotional distress; he was clean in appearance; his speech was

coherent and normal in rate and rhythm; his mood was stable but he

reported that he gets aggravated and anxious; his affect was flat;

his stream of thought was organized with no loose associations,

flight of ideas, or thought blocking;  he exhibited no evidence of

suffering from hallucinations or delusions; testing of his

immediate memory revealed that he could recall 1 items out of 3

after 3 minutes; his remote memory was intact; he was able to

recall his social security number, date of birth and address; he

was well oriented to person, place and time; his ability to

abstract similarities between items was intact; and his judgment

and insight were intact. Id.  Dr. Coronado's diagnosis was that

Trump suffered from bipolar disorder, not otherwise specified and

a history of marijuana and alcohol abuse. Id.  He gave Trump a GAF

---

[26]Abilify "is used to treat the symptoms of psychotic
conditions sucha as schizophrenia and bipolar disorder (manic
depression)." Abilify, Drugs.com, http://www.drugs.com/abilify.html
(Last accessed June 19, 2015).

score of 55, representing moderate symptomatology. Id.  Dr. Coronado recommended that Trump stop taking all of his current medications other than Trazodone as a sleep aid and that he commence taking Abilify. Tr. 347-348 and 361. Dr. Coronado scheduled a 4-week medication check followup appointment. Tr. 348.

On January 18, 2011, Ms. Inman completed a document on behalf of Trump entitled "Verification of Disability or Handicap" for the Housing Authority of the City of York, Pennsylvania. Tr. 365-366. In the document without specifying any work-related mental or physical limitations, Ms. Inman stated that Trump was disabled and unable to engage in any substantial gainful activity "by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months" and that the disability commenced before 2007. Tr. 365. She further stated that the nature of the disability was "bipolar disorder prohibiting regular employment occasional psychosis." Id.

On January 21, 2011, Trump had a medication check with Dr. Coronado. Tr. 355.  Dr. Coronado noted that Trump was compliant with his medications and he had no side effects; Trump's grooming was "clean;" Trump reported insomnia but inconsistently also stated he sleeps "ok" and he denied suicidal or homicidal thoughts; Trump's mood was labile and affect flat; he was cooperative and did not report delusions or paranoia but auditory hallucinations (hearing voices); and his speech and thought content were

24

organized. Id.  The diagnostic assessment remained essentially the same: bipolar 1 disorder, most recent/current episode mixed, unspecified (DSM Code 296.60). Id.  Trump was given a GAF score of 55. Id.

On January 26, 2011, George Ondis, Ph.D., a psychologist, reviewed Trump's medical records on behalf of the Bureau of Disability Determination and concluded that Trump suffered from a severe affective disorder and a severe substance addiction disorder but that those conditions did not meet or equal the criteria of any listed mental health impairment. Tr. 97-100. Dr. Ondis in his assessment of whether Trump met or equaled a listing concluded that Trump had mild mental health restrictions with respect to his activities of daily living; moderate limitations with respect to maintaining social functioning; moderate limitations with respect to maintaining concentration, persistence or pace; and no repeated episodes of decompensation each of an extended duration. Tr. 100.

Dr. Ondis in his assessment of Trump's mental residual functional capacity concluded that Trump had no marked or extreme limitations but was moderately limited in his ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruption from psychologically based symptoms

and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in a work setting. Tr. 101-103. Even with these moderate limitations Dr. Ondis concluded that Trump's basic memory processes were intact, as neither long nor short-term memory was reported to be significantly impaired; Trump can perform simple, routine, repetitive work at a consistent pace in a stable environment and can understand, retain and follow simple job instructions, that is, perform one and two-step tasks; he has the ability to work within a schedule and at a consistent pace for routine repetitive work; he has the ability to maintain concentration and attention for reasonably extended periods of time when performing routine and repetitive work; he would not require special supervision in order to sustain an ordinary work routine; he is able to take appropriate precautions to avoid hazards and can exercise appropriate judgment in the workplace; he can function in production oriented jobs requiring at least some level of independent decision-making; and although he may have some difficulty adjusting to sudden and unexpected changes, he can sustain an ordinary routine and adapt to changes without special supervision. Id.

The next medical record we encounter is a summary of

Trump's discharge from therapy at Adams-Hanover Counseling Services dated June 29, 2011. Tr. 391-392.  Social worker Einhorn stated that Trump had been attending therapy from October 30, 2010 to June 22, 2011, initially on a weekly basis and then once a month. Tr. 391. Mr. Einhorn stated that Trump at the time of discharge reported improvement in his mood swings and that he had better control of his outbursts. Id.  The discharge diagnosis was bipolar disorder and Trump was given a GAF score of 55. Id.  His discharge medications were listed as Abilify, Haldol, Thorazine, Vistaril, Celexa (citalopram),[27] trazodone, and lorezepam (Ativan). Id.

On September 16, 2011, Trump requested to resume outpatient counseling at Adams-Hanover Counseling Services. Tr. 393-395.  Trump's current medications were listed as Abilify, Haldol, Thorazine, Vistaril, Celexa, Ativan, and trazodone. Tr. 393-394.  Trump reported that his current medications were effective. Tr. 393.  A mental status examination revealed that Trump was alert and oriented to person, place, time and situation; he was well-groomed; he had good behavior, eye contact and motor activity; he was cooperative; his mood was depressed and his affect broad; he reported fair sleep and a good appetite; his thought processes were logical and organized and his thought content was normal; he had no perceptual disturbances or hallucinations; he

---

[27]Celexa "is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors[.]" Celexa, Drugs.com, http://www.drugs.com/celexa.html (Last accessed June 19, 2015).

denied suicidal and homicidal thoughts; his judgment and insight regarding his disorder were intact; and his memory was intact and his intelligence average. Tr. 394-395. Trump's diagnosis was bipolar disorder and his GAF score was 55. Id.

On April 4, 2012, Trump had a medication management appointment with Dr. Coronado. Tr. 400. Dr. Coronado noted that Trump was compliant with his medications but reported that he felt fatigued, exhausted and withdrawn. Dr. Coronado adjusted Trump's medications. Id. Trump's diagnosis was bipolar disorder and his GAF score was 55.  Id.

On April 23,2012, Trump had an appointment with a social worker at Adams-Hanover Counseling Services. Tr. 399. Trump reported that he was involved in a church choir and helps take care of a friend's elderly mother but also reported that his "[d]epression[was] to the point of not being able to get out of bed 1-2 times per week when he has no plans for the day." Id.  Trump's diagnosis was bipolar disorder and his GAF score was 55. Tr. 396.

Less than two weeks later, on May 2, 2012, at a medication management appointment with Dr. Coronado, Trump reported that he was compliant with his medications, he was less depressed, and he experienced no medication side effects. Tr. 401. Trump also reported that he was sleeping better and was not experiencing the "ups and downs" as much. Id. Trump's diagnosis was bipolar disorder and his GAF score was 55. Id.

On May 30, 2012, Trump had a medication management appointment with Dr. Coronado. Tr. 403.  Trump reported that he felt fine; he was not sleeping during the day; he was able to get up during the day and do things around the house such as mow the lawn and read outside; he played the cello and had lessons on Wednesday nights; and he was involved with his church two times per week. Id.  Trump's diagnosis remained bipolar disorder and his GAF score was 55. Id.

On June 18, 2012, at the request of Trump's attorney, William J. Bowman, II, a Master's degree level licensed psychologist, issued a psychological report based on interviews and personality testing(Minnesota Multiphasic Personality Inventory – 2) of Trump conducted on May 8 and 14, and June 7 and 11, 2012. Tr. 373-377.  There is no indication that Mr. Bowman reviewed any of Trump's medical records and the history of Trump's condition was gleaned from what Trump reported during the interviews. Tr. 373. In contrast to the records of social workers at Adams-Hanover Counseling Services and Dr. Coronado, Mr. Bowman reported that Trump had side effects of his medications which caused fatigue, somnolence and concentration difficulties to the point that he is unable to maintain employment. Tr. 375. Mr. Bowman further somewhat inconsistently stated that "[w]hile being compliant with medication and therapy Mr. Trump has maintained lucidity, abate (sic) psychotic symptoms, stabilize (sic) moods and managed daily living

skills. Id. Mr. Bowman based on the series of interviews and personality testing further opined with respect to Trump's limitations in the areas of activities of daily living, social functioning and maintaining concentration, persistence or pace. Tr. 377. Mr. Bowman stated that Trump had moderate restrictions in activities of daily living; marked difficulties in maintaining social functioning; and extreme deficiencies of concentration, persistence or pace; and repeated episodes of decompensation.[28]

With respect to Trump's mental abilities for unskilled work, Mr. Bowman opined that Trump had an unlimited or very good ability[29] to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; a limited but satisfactory ability to understand and remember very short and

---

[28]Repeated episodes of decompensation, each of an extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. Mr. Bowman did not point to such repeated episodes of decompensation of an extended duration and the record does not reveal any such episodes after the alleged disability onset date of September 17, 2010.

[29]The document completed by Mr. Bowman was one prepared by Trump's attorney and provided that the various abilities be rated as "VG", "LS", "S", "U", and "N". Tr. 377. "VG" was defined as an "[u]nlimited or very good" ability; "LS" was defined as a "[l]imited but satisfactory" ability; "S" was defined as "[s]eriously limited, but not precluded – means ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances;' "U" was defined as "[u]nable to meet competitive standards – means your patient cannot satisfactorily perform this activity independently . . . and on a sustained basis in a regular work setting;" and "N" was defined as "[n]o useful ability to function, an extreme limitation – means your patient cannot perform this activity in a regular work setting." Id.

simple instructions, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, ask simple questions or request assistance, and respond appropriately to changes in a routine work setting; Trump was seriously limited with respect to remembering work-like procedures, carrying out very short and simple instructions, sustaining an ordinary routine without special supervision, accepting instructions and responding appropriately to criticism from supervisors, and dealing with normal work stress; Trump was unable to meet competitive standards with respect to maintaining regular attendance and being punctual within customary tolerances, completing a normal workday and workweek without interruption from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and being aware of normal hazards and taking appropriate precautions; and Trump had no useful ability to maintain attention for two hour segments. Tr. 377.

Mr. Bowman's diagnostic assessment was that Trump suffered from bipolar 1 disorder, most recent episode depressed with psychotic features in remission and he gave Trump a current GAF score of 32 and a highest GAF score in the last year of 32.[30] Tr. 375-376. Mr. Bowman did not specify the effective date of Trump's

---

[30]This highest GAF score of 32 in the last year is at odds with the repeated GAF score assessments of 55 by Dr. Coronado, a treating psychiatrist.

impairments but that they had lasted for 12 months. Tr. 377.

**<u>DISCUSSION</u>**

The administrative law judge at step one of the sequential evaluation process found that Trump had not engaged in substantial gainful work activity since September 17, 2010, the alleged disability onset date set forth by Trump's in his applications. Tr. 18.

At step two of the sequential evaluation process, the administrative law judge found that Trump had the severe impairment of bipolar disorder. <u>Id.</u> Trump's has not challenged the administrative law judge's step 2 analysis.

At step three of the sequential evaluation process the administrative law judge found that Trump's impairments did not individually or in combination meet or equal a listed impairment. Tr. 19-20. At this step the administrative law judge in addressing the listed mental impairments stated that Trump had mild restrictions in activities of daily living, moderate difficulties in social functioning, marked difficulties in concentration, persistence and pace and no repeated episodes of decompensation, each of an extended duration. Tr. 19. Consequently, the administrative law judge found Trump did not meet the requirements of any listed mental health condition. <u>Id.</u> In the concluding paragraph of the step 3 analysis the administrative law judge further indicated that the mild, moderate and marked limitations he identified were not a residual functional capacity assessment

but only used to rate the severity of the mental impairment at steps 2 and 3 of the sequential evaluation process and that the mental and residual functional capacity used at steps 4 and 5 would involve a more detailed assessment by itemizing various functions contained in the broad categories of the listed mental disorders. Tr. 20.   He further stated that the mental residual functional capacity assessment at step 4 would reflect the degree of limitation found by him at step 3. Id.   Trump has not challenged the administrative law judge's step three analysis.

At step four of the sequential evaluation process the administrative law judge found that although Trump could not perform his prior relevant work he had the residual functional capacity to perform a full range of work at all exertional levels but with certain nonexertional limitations. Id.   Specifically, the administrative law judge found that Trump

> is limited to only occasional changes in the routine work setting. He is limited to occupations with a GED reasoning level of two, where the employee is expected to apply commonsense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables on or from standardized situations. [Trump's] attention and concentration is limited to 90% of a workday. He is able to have only occasional interaction with members of the public, coworkers and supervisors. [He] can sustain attention and concentration no more than two hours at a time at which time he must have an opportunity for a five minute break (or longer than five minutes if it is time for a regular break or a lunch break). [His] pace of work must not be dictated by others, but he can be expected to maintain production levels at his own pace.   He must be expected to leave early, arrive late or not come into work at all for a cumulative average of one day per month.

Id. In setting the residual functional capacity, the administrative law judge reviewed the medical records and considered several other items including the medical notes of treating physicians and the report from the state agency psychologist who reviewed Trump's medical records. Tr. 21-23. The administrative law judge considered the opinion of Dr. Ondis, the state agency psychologist, but gave Trump the benefit of the doubt finding that he had marked limitations in concentration, persistence or pace at step 3 of the sequential process, instead of moderate as found by Dr. Ondis. Tr. 23. The administrative law judge also considered the opinion of Dr. Bowman but concluded that his disability opinion and GAF score of 32 were not credible because it was only based on a snapshot of Trump's functioning and it was not consistent with the GAF scores of the treating medical providers. Id. Furthermore, the administrative law judge found that Trump's statements about his functional limitations, as well as the statements of Trump's friend, were not credible to the extent they were inconsistent with the above residual functional capacity. Tr. 21.

Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge found at step five that Trump had the ability to perform unskilled, light work such as a bench assembler and an electrical accessories assembler and that there were a significant number of such jobs in the local and national economies. Tr. 24.

The administrative record in this case is 411 pages in length, primarily consisting of medical and vocational records. The administrative law judge did an adequate job of reviewing Trump's medical history and vocational background in his decision. Tr. 16-25. Furthermore, the brief submitted by the Commissioner sufficiently reviews the medical and vocational evidence in this case. Doc. 12, Brief of Defendant.

Trump argues that the administrative law judge erred (1) by not including credibly established limitations in the hypothetical posed to the vocational expert and in the mental residual functional capacity assessment at step 4 of the sequential evaluation process and (2) by not addressing the opinion of Dr. Bowman. We have thoroughly reviewed the record in this case and find no merit in Trump's arguments.

Initially we will note that no treating physician has indicated that Trump suffered from mental functional limitations that would preclude him from engaging in the unskilled, light work identified by the administrative law judge in his decision for the requisite statutory 12 month period.[31] Furthermore, we cannot

---

[31]As stated earlier in this memorandum to receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A)(emphasis added). Although Dr. Bowman's opinion would preclude Trump from engaging in this work activity, there is no indication that at the time he rendered his opinion he was a treating physician. Counsel suggests that Dr. Bowman became a treating physician at some point after he rendered his opinion.

conclude from the bare medical records that Trump is totally disabled from a mental standpoint. The administrative law judge identified unskilled, light work positions which Trump could perform. No treating physician indicated that Trump was incapable of working at that modest level on a full-time basis and the administrative law judge gave an adequate explanation for rejecting the opinion of Dr. Bowman.

Trump argues that the administrative law judge did not include in the residual functional capacity the marked limitation in concentration, persistence and pace which he found at step three of the sequential evaluation process. However, as noted above the administrative law judge explained that the mild, moderate and marked limitations were only in conjunction with rating the severity of the mental impairment at steps 2 and 3 of the sequential evaluation process and not a residual functional capacity assessment. In light of that explanation we see no inconsistency between the marked limitation at steps 2 and 3 and the administrative law judge's ultimate residual functional capacity assessment.[32] Moreover, the state agency psychologist,

---

However, we cannot speculate regarding what Dr. Bowman's opinion was at the time of the administrative hearing held on June 22, 2012, and when the administrative law judge rendered his decision on July 25, 2012.

[32]Assuming for purposes of argument that an error was committed by the administrative law judge, we consider the error harmless in light of the totality of the evidence, including the GAF scores assessed by Dr. Coronado. See Weary v. Astrue, Civil No. 10-896, slip op. at 40-41 (M.D.Pa. Dec. 15, 2010)(Muir, J.)(applying

Dr. Ondis, found that Trump only had a moderate limitation in maintaining concentration, persistence and pace.

The administrative law judge stated that Trump's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ability to perform a range of unskilled, light work. There is no basis to question that credibility judgment. The administrative law judge was not required to accept Trump's claims regarding his mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and

---

harmless error analysis); Boyd v. Astrue, Civil No. 11-600, slip op. at 25-26 & 28 (M.D. Pa. May 10, 2012)(Munley, J.).

heard Trump testify, the administrative law judge is the one best suited to assess the credibility of Trump.

Furthermore, the administrative law judge adequately reviewed the statements submitted by the friend of Trump. The administrative law judge appropriately considered that statement in light of the medical records, including the GAF scores assessed by Dr. Coronado.

Finally, even assuming that Dr. Bowman was a treating physician, the social security regulations specify that the opinion of a treating physician may be accorded <u>controlling</u> weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. In this case the administrative law judge gave an adequate explanation for rejecting the opinion of Dr. Bowman

We are satisfied that the administrative law judge appropriately took into account all of Trump's limitations in the residual functional capacity assessment. Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.